THE STATE OF NEW JERSEY v. ALBERT C. TWINING AND DAVID C. CORNELL.

Argued February 21, 1905—Decided November 13, 1905.

1. Section 17 of the act entitled "An act concerning trust companies" (Revision of 1899, *Pamph. L.* 1899, *p.* 450), which makes it a misdemeanor for any director, officer, agent or clerk of any trust company to knowingly subscribe or exhibit any false paper with intent to deceive any person authorized to examine as to the condition of such trust company, is not in conflict with article 4, section 7, subdivision 4, of the state constitution, which provides that every law shall embrace but one object and that shall be expressed in its title.

2. A penal clause in a general statute embracing a given subject, which simply provides for the punishment for the violation of the provisions of such act, is not the intermixing in such act of things which have no proper relation to each other.

3. It is within the power of the legislature, in enacting a general law for the creation, government and control of all trust companies, to impose, under given conditions, certain limitations upon the powers granted or to reserve to existing trust companies brought under the act certain powers already possessed by them under existing laws, and to make it a misdemeanor for the officers of companies brought under the general act to do the things prohibited by the general statute, although the things made misdemeanors by the general law were not such under the act under which the trust company so brought under the general law was incorporated.

4. The exhibiting of a false minute, of an alleged meeting of the board of directors of a trust company, to an examiner appointed by the banking department, with the intent to deceive such examiner as to the financial condition of the company, is the exhibiting of a false paper under the statute, and is a misdemeanor under section 17 of the general Trust Company act of 1899.

5. Where one of two officers of a trust company produces a false minute to the examiner in the presence of the other, who by his silence acquiesces in such exhibition, although he knows of its falsity, both are guilty of exhibiting under the statute.

6. It is not error to permit an examiner of the banking department to testify that he was acting as such examiner when the false paper was exhibited. A public officer may testify that he is such officer without producing his certificate of appointment or official commission.

On error to Monmouth Quarter Sessions.

Before GUMMERE, CHIEF JUSTICE, and Justices FORT and GARRETSON.

For the state, *Henry M. Nevius*, prosecutor.

For the defendant, *Eusebius W. Arrowsmith, Vredenburgh, Wall & Van Winkle* and *Edward M. Colie.*

The opinion of the court was delivered by

FORT, J.    The defendants were convicted in the Monmouth Quarter Sessions for exhibiting to an examiner of the state banking department a certain false paper, knowing it to be false, with the intent to deceive such examiner as to the condition of the Monmouth Trust and Safe Deposit Company, of which company Twining was the president and Cornell the treasurer. The false paper consisted of a type-written copy of a minute of an alleged meeting of the board of directors of the trust company, which meeting was in fact never held.

The minute purports to be an authorization for the purchase of three hundred and eighty-one shares of the capital stock of the First National Bank of Asbury Park, which was found by the examiner among the assets of the trust company.

The jury found that the paper was exhibited, and the proof was conclusive that it was false.

The indictment is founded upon the violation of section 17 of the Trust Company act of 1899. *Pamph. L., p.* 450.

The first contention of the defendant is that the section of the act under which the indictment is found is unconstitutional, in that it is a subject-matter, in the body of the act, which is not embraced in its title. *State Const., art.* 4, *sec.* 7, *subd.* 4.

The title of the act is "An act concerning trust companies" (Revision of 1899). *Pamph L., p.* 450. The section in question reads as follows:

"Every director, officer, agent or clerk of any trust company who willfully and knowingly subscribes or makes any

false statement of facts, or false entries in the books of such trust company, or knowingly subscribes or exhibits any false paper, with intent to deceive any person authorized to examine as to the condition of such trust company, or willfully or knowingly subscribes to or makes any false report, shall be guilty of a high misdemeanor and punished accordingly." .

. If we fully comprehend the suggestion of counsel, it is that a criminal offence cannot be provided for under the title of the act in this case, or, in fact, under the title of any act, which does not specifically relate to the fact that a criminal offence is created by the body of the act.

Does the act in question have more than one object?

. An examination of its provisions will show that they all refer to trust companies. They do not relate to banks or insurance companies, or other corporations. The penalty imposed by section 17 is limited in its effect to directors, officers, agents or clerks of any trust company.

It seems to us that all matters of formation, management, control, regulation, offences and penalties are germane to a statute which covers, and is intended to cover, an entire subject-matter, and that a statute embracing the whole subject-matter of trust companies, which is entitled "An act concerning trust companies," may constitutionally include a provision making it an offence to do or fail to do certain named things in the operation and management of a trust company by its directors, officers, agents or clerks.

By the uniform course of legislation in the state since the adoption of the constitution of 1844, it has been the practice by the legislature to embody in acts relating to an entire subject-matter penal provisions for the doing of things not permitted by the statute, or the doing of acts prohibited thereby. Upon almost every subject of general legislation this condition of the statute law of the state will be found to exist. Sections making certain acts misdemeanors are found in the Banking act (*Pamph. L.* 1899, *p.* 431, §§ 12, 14, 21); the Savings Bank act (*Gen. Stat., p.* 2999, §§ 46,

47, 83) ; the Trust Company act (*Pamph. L.* 1899, *p.* 450, §§ 15, 17) ; the Building and Loan act (*Pamph. L.* 1903, *p.* 476, § 52) ; the Oyster act (*Gen. Stat., p.* 833, §§ 140, 156, 158, 172) ; the Chosen Freeholder act (*Gen. Stat., p.* 434, § 142 ; the Bottling act (*Pamph. L.* 1891, *p.* 218) ; the acts for protection of graveyards and cemetery associations (*Gen. Stat., p.* 355, § 34, and *p.* 361, § 57) ; the Civil Rights act (*Gen. Stat., p.* 804, § 2) ; the Food and Drug act (*Gen. Stat., p.* 1178, § 94) ; the Dentistry act (*Pamph. L.* 1898, *p.* 119)—a conviction under this act was sustained in *State* v. *Chapman,* 40 *Vroom* 464 ; affirmed, 41 *Id.* 339 ; the Fish and Game act (*Gen. Stat., p.* 1593, §§ 177, 182, 192 ; the Health act (*Gen. Stat., p.* 1634, §§ 206, 207, 208, 209, 210, 216) ; the Labor act (*Gen. Stat., p.* 1904, § 42) ; the Gun-powder act (*Gen. Stat., p.* 1621) ; the Honey Industry act (*Gen. Stat., p.* 1685, § 3) ; the Itinerant Vendors' act (*Gen. Stat., p.* 1826, § 13) ; the Justices' act (*Gen. Stat., p.* 1862, § 25), and the Intoxicating Liquor act (*Gen. Stat., p.* 1786, §§ 150, 200). In the "Act to regulate elections," revised in 1898, penal sections are found from sections 188 to 213, inclusive (*Pamph. L.* 1898, *p.* 237) ; the Medicine and Surgery act (*Gen. Stat., p.* 2080, §§ 14, 25, 36, 50) ; the Pharmacy act (*Gen. Stat., p.* 2459, § 9) ; the revision of the Tax act (*Pamph. L.* 1903, *p.* 394, §§ 61, 62) ; the Ware-houseman's act (*Gen. Stat., p.* 3746, § 7) ; in the Oaths and Affidavits act (*Gen. Stat., p.* 2329), many penal sections will be found ; the Harbor Masters' act (*Gen. Stat., p.* 2323, § 64 ; the Pilots' act (*Gen. Stat., p.* 2472, § 65) ; the Weights and Measures act (*Gen. Stat., p.* 3751, § 13), and many others.

We are not prepared to overthrow all the penal clauses in practically all the general acts of the state, after a uniform practice of over half a century of treating such clauses as germane to statutes embodying but a single subject.

We think, where a penal clause in a statute embracing a given subject simply relates to and provides for the punishment of violations of the provisions of such act, that such a provision is not in conflict with article 4, section 7, para-

graph 4 of the state constitution, and that it is not essential to valid legislation against offences created by such acts that they should be enacted under the title of "An act for the punishment of crimes."

The case chiefly relied upon to sustain the contention of the plaintiff in error was *Shivers* v. *Newton,* 16 *Vroom* 469. An examination of this case will show it to sustain the view we take. The title of the act there was "An act to prevent the adulteration and to regulate the sale of milk." Mr. Justice Reed points out that under this title only penalties for adulterating milk could be embodied in the act, while the second section of the act imposed a penalty for the production of unwholesome milk by other methods. He says: "The latter prohibition is, in my judgment, clearly outside the object of the legislation as expressed in the title." The penalty imposed by the Trust Company act, under which the defendants were convicted, relates to the duties of the officers of a trust company conducting business under the act, and to the punishment for the violation of those duties in any of the respects provided for in the act. This does not seem to us to be within the reasoning of *Shivers* v. *Newton, supra.*

The next contention is that the defendants were officers of the Monmouth Trust and Safe Deposit Company, and were organized under the act of 1885, entitled "An act for the incorporation of safe deposit and trust companies" (*Pamph. L.* 1885, *p.* 270), and that section 17 of the act of 1899, entitled "An act concerning trust companies," under which this indictment was found, does not apply to "safe deposit and trust companies" created under the act of 1885.

In 1899 there was a revision of all the acts relative to trust and safe deposit companies, and separate statutes were passed for the organization of each, and all trust company and safe deposit company acts, and acts for the creation of safe deposit and trust companies, were repealed. *Pamph. L.* 1899, *pp.* 450, 468, 474.

The act of 1885 is expressly repealed by section 4 of the statute last cited.

By section 8 of the repealing act, all vested rights of the

companies organized under the acts repealed are reserved, with the right in the companies to continue to enjoy the rights and advantages which they then enjoyed (*Pamph. L.* 1899, *p.* 475) ; and by section 30 of the Trust Company revision of 1899, it is expressly enacted that "the provisions of this act shall be applicable to, and the words 'trust company,' when used in this act, shall be construed to include all trust companies, and all safe deposit and trust companies, heretofore organized under the laws of this state, whether by special charter or under general act or otherwise, as well as corporations hereafter organized under this act." This section also reserves to trust and safe deposit companies the rights and privileges they now possess.

It is within the power of the legislature, in passing a general act, to reserve and preserve rights and privileges existing in any class of corporations brought under the provisions of a general law. Such an act is not open to the objection of being special (*Dickinson* v. *Board of Freeholders,* 42 *Vroom* 589), nor to the contention that such a reservation is not embraced within the title of the act.

Limitations upon a power granted by an act, or the reservation of powers existing in certain corporations brought under the act, in addition to those granted, are proper subject-matters to be embodied in a statute, where the powers relate to the class concerning which the legislation is enacted. All such provisions are germane to the subject-matter of the legislation embraced within the statute.

It is clearly within the right of the legislature, while reserving powers existing in a corporation, to provide that in the future exercise of such powers the company or its officers shall be subject to certain restrictions and liable to punishment for their violation. That is all that is done by this statute.

It was further argued that, conceding the statute under which this indictment is found to be valid, the document exhibited in this case cannot be said to be a false paper within the meaning of the act, the contention being that "knowingly subscribes or exhibits any false paper" means

negotiable paper, or some paper which is a part of the assets of the bank. We are unable to give this narrow construction to these words, in the connection in which they stand in the statute. We think it means what it says—"subscribes or exhibits any false paper, with intent to deceive the examiner." Any other construction destroys all force to the word "subscribes," and any construction which sustains the theory that an offence exists by subscribing a false paper also upholds the construction that to exhibit such false paper to the examiner, with intent to deceive, is within the statute.

But, it is further insisted that "the false paper must be one that can deceive the examiner as to the financial condition of the corporation." We agree with that view. We think under the proof that in exhibiting this paper it was the purpose of the defendants to deceive the examiner as to the financial condition of the bank. The proof was that the stock, the purchase of which the false minute purported to authorize, was in fact the stock of the defendants and other officers and directors of the trust company. That at the time they actually entered the transaction upon the books of the trust company the stock was worthless, the First National Bank, of Asbury Park, having failed. If this action of the board of directors had actually taken place, and the purchase been made in good faith, the trust company had not only lost the value of this stock, but was liable to assessment, as the owner of the stock, under the National Banking act, in case of a deficit in the funds of the Asbury Park National Bank, while the defendants were released, not only to the trust company, but as stockholders in the Asbury Park National Bank for any deficiency assessment.

They had shifted their worthless asset and its contingent liability upon the trust company. Did not that affect its financial condition?

If the transaction did not occur, as the false minute alleged, then the defendants, and the others interested with them in the stock matter, were liable to the trust company, to reimburse it for the stock which they as officers had sold to the trust company, and fraudulently taken $45,000 of its funds

to pay therefor to themselves. An agent, such as these officers, cannot deal with the company (his principal) and pass over stock to it and take its funds in payment therefor. Whether the directors had authorized it, therefore, was of vital importance to the financial condition of the trust company, and to the examiner in reporting upon its financial condition. Its acceptance covered the fraud of the defendants and held the trust company to a bargain not otherwise legal, and relieved the defendants from liability to the trust company for the fraudulent depletion of the assets of the trust company to the extent of their unlawful act in the matter. Without the false minute to exhibit the trust company could repudiate the transaction and hold the defendants for the whole amount. Upon the question of what was the true financial condition of the trust company the false minute was vital to the examiner.

The evidence, it is claimed, does not prove that the defendant Twining exhibited the false minute to the examiner.

The testimony of the examiner was that he asked for the authority for this purchase. The proof was that Twining had dictated the false minute to his stenographer, and after it was written had placed it in the minute book. That he was present in an adjoining room when the examiner asked for it, and that the defendant Cornell told the examiner that it was in the minute book, and that either the examiner himself went and got the minute book or that Cornell handed it to him.

The examiner says specifically that Cornell was present when he received the minute book with this false minute in it, and he thinks he handed it to him; that on the 14th day of February, the day he first went to the company, Twining, he thinks, told him it was the minutes of the board, but, if he did not do so on that day, he is positive he did on the 16th, which was the Monday following, and was while he was still examining the bank. Any statement by Twining before or after the minutes came into the hands of the examiner and while he was examining the bank, that that was the minute of the board authorizing the purchase, was an exhibition of

the minute. To state to the examiner that that was the minute, for the purpose of deceiving him as to the truth, was to exhibit the minute within the statute.

In this connection reference should be made to the exception taken to the charge of the trial judge, that "If you are satisfied that one produced the false minutes, and that with the consent of the other, he being present and by his silence acquiescing in it, with full knowledge that it was being produced and exhibited for the purpose of deceiving the examiner, Twining is just as guilty as Cornell."

There was no error in this. In misdemeanors all are principals. Standing by while a co-misdemeanant does the act of exhibiting makes you guilty. Both will be deemed to exhibit under such circumstances.

We see no error in including in the indictment the prefatory matter which is objected to. It is at most mere surplusage. The charge upon which the defendants were tried, and the evidence introduced, was the exhibition of the false paper only. The indictment was not offered in evidence and did not go to the jury. It could not have prejudiced in any way the trial of the defendants.

We find no error in the suggestion that the witness Vredenburgh, who was the examiner, was permitted to testify to the fact that he was an examiner, and that the court did not require him to show written authority that he was authorized to examine the bank. The statute does not require the banking commissioner to appoint his examiners in writing. That he was examining for and by the direction of the banking department was proved. About the fact there was no question. An official may testify that he is such official without producing his certificate of appointment. *Den* v. *Pond, Coxe* 379; *Potter* v. *Luther,* 3 *Johns.* 431; *Berryman* v. *Wise,* 4 *Term Rep.* 366; *Brewster* v. *Vail, Spenc.* 56; *Reeves* v. *Ferguson,* 2 *Vroom* 107 (at *p.* 119); 1 *Greenl. Evid.,* §§ 83, 92.

The Cornell confession was properly admitted as against Cornell, and the court expressly limited its evidential force to Cornell in admitting the evidence, and again on the request

of counsel at the end of the charge. In the charge to the jury the court referred to the fact that the defendants did not see fit to go upon the stand in their own behalf and said, "because a man does not go upon the stand you are not necessarily justified in drawing an inference of guilt. But you have a right to consider the fact that he does not go upon the stand where a direct accusation is made against him." This was not objectionable. *Parker* v. *State,* 32 *Vroom* 308; *State* v. *Wines,* 36 *Id.* 31.

The entire record is returned in this case, and it not appearing that the defendants suffered manifest wrong or injury in the admission or rejection of evidence or the charge of the court, the judgment of the Monmouth Quarter Sessions is affirmed.